760 So.2d 80 (2000)
CITY OF HOMESTEAD, Appellant,
v.
Julia L. JOHNSON, etc., et al., Appellees.
No. SC91820.
Supreme Court of Florida.
March 16, 2000.
*81 L. Lee Williams, Jr. of Williams & Gautier, P.A., Tallahassee, Florida, for Appellant.
Robert D. Vandiver, General Counsel, and Diana W. Caldwell, Associate General Counsel, Florida Public Service Commission, Tallahassee, Florida; Mark K. Logan of Smith, Ballard & Logan, P.A., Tallahassee, Florida; and Wilton R. Miller of Bryant, Miller & Olive, Tallahassee, Florida, for Appellees.
QUINCE, J.
We have on appeal a decision by the Public Service Commission (PSC) relating to the interpretation of a territorial agreement for electrical service. We have jurisdiction. See Art. V, § 3(b)(2), Fla. Const. We affirm the PSC's decision which gives Florida Power & Light Company the right to provide electrical service to the disputed territory because the industrial park is not a "city-owned facility" within the meaning of the territorial agreement
In 1967 Florida Power & Light Company (FPL) entered into a territorial agreement (the agreement) with the City of Homestead (the City). The purpose of the agreement was to prevent FPL and the City from duplicating efforts to provide electricity to the City and surrounding areas. The agreement essentially allowed the City to service all the areas located within the City's boundaries as they were defined in the agreement and allowed FPL to service all the surrounding areas. Paragraph 6 of the agreement provided the City and FPL's service areas would remain the same, notwithstanding any growth in the City's boundaries. Paragraph 8[1] contained one exception which allowed the City to furnish service to "city-owned facilities" and facilities owned by agencies which derive their power through and from the City. In the thirty years that have passed since FPL and the City entered into the agreement, the City has almost doubled in size and has vastly grown beyond the boundaries as defined at the time of the agreement. In addition, the parties and others affected by the territorial agreement have been before this Court on four prior occasions.[2]
*82 The present dispute between FPL and the City revolves around an industrial park situated on land owned by the City but located within FPL's service area. The City entered into a long-term lease of unimproved real property within the industrial park with several entities including Contender Boats, Inc.[3] The fifty-year lease allows the lessee to renew for an additional fifty years and grants the lessee an option to purchase the property at a discounted rate. The lessee has constructed a permanent building on the property to conduct business.
The City argues the building is a permanent fixture and, therefore, has become annexed to the property. See Burbridge v. Therrell, 110 Fla. 6, 148 So. 204 (1933)(holding permanent fixtures annexed, actually or constructively, become part of the freehold estate); Greenwald v. Graham, 100 Fla. 818, 130 So. 608 (1930)(same). Thus, the City opines the building is owned by the City, is a "city-owned facility," and falls under the exception in the agreement which allows the City to service "city-owned facilities." FPL argues the City has engaged in a sham lease to avoid the agreement because it has become dissatisfied with its limited service area. FPL contends the plain language of the agreement provides a limited exception for "city-owned facilities," meaning facilities with municipal or governmental functions.
FPL filed a petition with the PSC to enforce the commission's order approving the territorial agreement between FPL and the City. The PSC granted the relief sought by FPL by entering a notice of proposed agency action. The notice indicated the action taken would become final unless a request for a hearing was filed.[4] The City did not request a hearing; therefore, the notice became final on October 20, 1997. The City now challenges the agency action and alleges the City's motion for judgment on the pleadings and motion for final summary judgment should have been granted because the industrial park is a "city-owned facility."
In earlier litigation between these parties we said the PSC has authority over *83 these territorial agreements. In Public Service Commission v. Fuller, 551 So.2d 1210 (Fla.1989), we stated:
[U]nder chapter 89-292, section 2, Laws of Florida (to be codified at section 366.04(2)(e), Florida Statutes (1989)[[5]]), the .OPSC has the power "[t]o resolve, upon petition of a utility or on its own motion, any territorial dispute involving service areas between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction." We note that the City of Homestead has expressly acknowledged that the PSC has jurisdiction over this territorial agreement, and it has sought enforcement of the agreement under section 366.04(2). See Accursio v. Florida Power and Light Co.

Id. at 1212. Again, in the present litigation, the PSC was asked to determine the boundaries of the territorial agreement and to determine which utility would service customers in a particular area. Thus, the PSC properly determined it had jurisdiction over the matter.
We agree with the PSC's determination that the agreement must be interpreted in light of its stated purpose and that the term "city-owned facility" must be viewed in relation to the other terms and provisions contained within the agreement. Additionally, any ambiguity in the terms should be resolved in favor of upholding the purpose of the agreement and giving effect to every term in the agreement. See Ideal Farms Drainage Dist. v. Certain Lands, 154 Fla. 554, 19 So.2d 234 (1944).
The purpose of the agreement was and is to end duplicate efforts and expenses in supplying electricity to the City and surrounding area. See City of Homestead v. Beard, 600 So.2d 450 (Fla.1982). With this in mind, the PSC found the exceptions contained in paragraph 8 should be narrowly interpreted so that the City and FPL would not duplicate efforts.
There is no question that the land upon which the industrial park was built is owned by the City. Furthermore, it is undisputed that the land is located in the area serviced by FPL. FPL has facilities that are located immediately adjacent to the industrial park. Yet, the City has constructed extensions to its own electrical facilities in order to service this industrial park. From these facts the PSC concluded:
[A]n assessment of the evil to be prevented in entering into the Agreement aids in clarification of the phrase. Ideal Farms Drainage Dist. v. Certain Lands, 154 Fla. 554, 19 So.2d 234 (1944). The purpose of the Agreement was to end the unsatisfactory effects of expensive, competitive activity between the parties. City of Homestead v. Beard, 600 So.2d at 454. If the service area exception were read to allow the City to encroach upon FPL's service territory any time it purchases real property for any purpose, it would only promote expensive, competitive activity, a race to serve, and uneconomic duplication. This result is clearly contrary to the purpose of the Agreement and our mandate, pursuant to Section 366.04, Florida Statutes, to minimize uneconomic duplication.
*84 The mere fact that the City owns the land and a structure has been erected on the land does not necessarily make the building or the business conducted therein a "city-owned facility," i.e., a facility with a municipal or governmental function.
Secondly, as the PSC pointed out, we should look to the terms specifically mentioned in the agreement for guidance in determining the intent of the parties in using the term "city-owned facility." The Homestead Housing Authority Labor Camp (the Labor Camp) is specifically named in paragraph 8 as a "city-owned facility" that is to be serviced by the City, notwithstanding its location in FPL's territory. The Labor Camp serves as an example of the type of "city-owned facility" contemplated by the agreement. Under the doctrine of expressio unius est exclusio alterius,[6] paragraph 8 has a limited application to exclude from FPL's service area "city-owned facilities" similar to the Labor Camp, i.e., facilities that serve a municipal/governmental function. Had the City also intended to exclude from FPL's service area city-owned land not associated with the provision of municipal-type services from the agreement, it could have easily so stated by using the term city-owned property.
Additionally, application of the rule of construction that the meaning of particular terms may be ascertained by reference to other closely associated words in the agreement yields the same conclusion. General and specific words that are capable of analogous meanings when associated together take color from each other. See 49 Fla. Jur.2d Statutes § 127 (1984). Thus, the general phrase "city-owned facilities" is restricted to the narrower meaning of a "city-owned facility" with a municipal or governmental function by its close relationship to the other sentences in paragraph 8. See Orange County Audubon Soc'y v. Hold, 276 So.2d 542 (Fla. 4th DCA 1973). Specifically, paragraph 8 refers to the Labor Camp as a city-owned facility with a municipal/governmental function.
Finally, we rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof. See Sugar Cane Growers Cooperative of Florida, Inc., v. Pinnock, 735 So.2d 530, 535 (Fla. 4th DCA 1999)(holding contracts should be interpreted to give effect to all provisions); Paddock v. Bay Concrete Indus., Inc., 154 So.2d 313, 315 (Fla. 2d DCA 1963)(stating "All the various provisions of a contract must be so construed, if it can reasonably be done, as to give effect to each."). If the City were allowed to service any business or facility located on city-owned property, the City could circumvent the agreement by buying property and negotiating leases with any entrepreneur. Such a practice would negate the operation of paragraph 6, which states that the service territories will remain the same regardless of whether the City's boundaries grew. The PSC's interpretation of the agreement creates harmony between paragraphs 6 and 8 and gives effect to the purpose of the agreement.
The PSC's order relies upon well-settled principles of contractual construction. In addition, we note the City's attorney during oral argument acknowledged the City was the primary drafter of the agreement. An ambiguous term in a contract is to be construed against the drafter. See Planck v. Traders Diversified, Inc., 387 So.2d 440 (Fla. 4th DCA 1980). To the extent that this agreement is ambiguous, we construe it against the City.
We hereby affirm the PSC's order granting FPL the right to service the industrial park.[7]
It is so ordered.
*85 HARDING, C.J., and SHAW, WELLS and PARIENTE, JJ., concur.
ANSTEAD, J., dissents with an opinion.
LEWIS, J., recused.
ANSTEAD, J., dissenting.
While not unsympathetic to the policy implications of the majority opinion, I simply cannot find any ambiguity in the term "City-owned facilities."
NOTES
[1] Paragraph 8 provides:

Notwithstanding the provisions of paragraph 6 hereof, it is agreed that the City shall supply power to and, for purposes of this Agreement, shall consider that the Homestead Housing Authority Labor Camp located on the Easterly side of Tallahassee Road (SW. 137th Avenue) is within the service area of the City, including any additions to or extensions of said facilities of the Homestead Housing Authority. The City's right to furnish service to the City-owned facilities, or those owned by agencies deriving their power through and from the City (including but not limited to the Homestead Housing Authority) may be served by the said City, notwithstanding that the said facilities are located within the service area of [FPL].
[2] The prior litigation includes: Storey v. Mayo, 217 So.2d 304 (Fla.1968)(This case was brought by consumers who were transferred from FPL to the City for service.); Accursio v. Mayo, 389 So.2d 1002 (Fla.1980)(Again FPL customers opposed implementation of the agreement.); Public Service Comm'n v. Fuller, 551 So.2d 1210 (Fla.1989)(The PSC filed a petition for writ of prohibition to prevent the circuit court from conducting proceedings to modify the agreement.); and City of Homestead v. Beard, 600 So.2d 450 (Fla.1992)(The City attempted to terminate the agreement by alleging the agreement was terminable at will.)
[3] In fact, the City had leased two parcels of the property, one to Silver Eagle Distributors, Ltd. (Silver Eagle) and one to Contender Boats, Inc. The City sold the Silver Eagle property while this case was pending. Therefore, the issue is moot with regard to the Silver Eagle property.
[4] There has been some confusion over whether the City waived its right to file an appeal with this Court by failing to request a hearing from the PSC, and whether the City's motion was timely filed. The notice provided:

ORDERED that the provisions of this Order, issued as proposed agency action, shall become final and effective unless an appropriate petition, in the form provided by Rule 25-22.036, Florida Administrative Code, is received by the Director, Division of Records and Reporting, 2540 Shumard Oak Boulevard, Tallahassee, Florida XXXXX-XXXX, by the close of business on the date set forth in the Notice of Further Proceedings or Judicial Review attached hereto. It is further
ORDERED that in the event this Order becomes final, this Docket shall be closed.
The Notice of Further Proceedings or Judicial Review stated that notice of proposed agency action would become final on October 20, 1997, if no administrative appeal was filed. However, it also stated: "If this order becomes final and effective on the date described above, any party substantially affected may request judicial review by the Florida Supreme Court." The City never requested a formal administrative hearing. Instead, the City waited until after the order became final and then filed a Notice of Administrative Appeal with this Court on November 17, 1997.
We find the City did not waive its right to appeal the PSC's order to this Court because the Notice of Further Proceedings or Judicial Review specifically stated any party substantially affected by the final order could file an appeal with the Florida Supreme Court. The City was entitled to rely upon the final order's directions for requesting an appeal. We do note, however, that the better practice would be for the PSC to enter a separate final order to avoid this confusion in the future. See United Water Florida, Inc. v. Florida Public Serv. Comm'n., 728 So.2d 1250 (Fla. 1st DCA 1999)(holding the PSC could not issue a notice of proposed agency action without a hearing and then allow the notice to become the final order if it went unchallenged).
[5] This provision of chapter 366 remains intact and is applicable to these proceedings. Section 366.04(2)(e), Florida Statutes (1999), provides:

[T]he commission shall have power over electric utilities for the following purposes:
. . . .
(e) To resolve, upon petition of a utility or on its own motion, any territorial dispute involving service areas between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. In resolving territorial disputes, the commission may consider, but not be limited to the consideration of, the ability of the utilities to expand services within their own capabilities and the nature of the area involved, including population, the degree of urbanization of the area, its proximity to other urban areas, and the present and reasonably foreseeable future requirements of the area for other utility services.
[6] Meaning the expression of one term implies the exclusion of other terms not mentioned.
[7] The PSC's order reserved jurisdiction to consider awarding attorney's fees. The City has requested the Court review the PSC's authority to issue attorney's fees under section 120.69(1)(a), Florida Statutes (1997). This issue is not ripe and, therefore, is not considered by the Court in this opinion.